In re EISENBERG et al.

No. 20443.

District Court, E. D. Pennsylvania.

Sept. 29, 1941.

Wexler & Weisman, of Philadelphia, Pa., for trustee.

Levi, Mandel & Miller, of Philadelphia, Pa., for respondents.

KALODNER, District Judge.

This is a review of the referee's decision denying the trustee's petition for an order against the bankrupt to turn over certain assets. The proceedings are for what is commonly known as a "turnover order".

The bankrupts were clothing manufacturers who began this business on May 1, 1937. The method of manufacture was to cut the cloth, which they had previously purchased, at their own plant; the cut garments were then sent to outside contractors for completion and assembling.

On June 21, 1938, they filed a petition under Section 74 of the Bankruptcy Act, 11 U.S.C.A. § 202, in which proceedings they sought to effect a settlement with their creditors. Several settlements were proposed but none was accepted by the creditors. Finally, on October 8, 1938, an order of liquidation was entered.

On February 24, 1939, the trustee filed a petition for an order on the bankrupts to turn over certain quantities of suits, pants, trimmings and linings. The application for the order to turn over the trimmings and linings was subsequently abandoned by the trustee. A voluminous record of 361 pages, exclusive of exhibits, was made in the hearings before the referee. The referee dismissed the trustee's petition.

The facts of the case will be more fully developed in the discussion of the three questions which the referee poses as essentially controlling this case:

(1) Whether a certain book marked "Exhibit 27" has been properly proved so as to become relevant in this proceeding;

(2) Whether the inventory and appraisement of May 31, 1938 prepared by Fred B. Emerson et al. is true and correct; and

(3) Whether the report prepared by Morris Cohen et al. is based upon clear and convincing proofs.

With reference to the first question, it appears that in the general examination (the portion of which was offered in the turnover proceedings) Morris Eisenberg, one of the bankrupts, identified this book as the "production record" which his nephew Al ("Little Al") Eisenberg maintained under his, Morris Eisenberg's, supervision. The testimony further shows, and it was not denied, that this book had been turned over to and used by the bankrupts' own accountants in making reports for the bankrupts to justify the settlement which they attempted to make. This book was likewise turned over by the bankrupts to Mr. Cohen, the trustee's accountant, together with all the other records of the bankrupts, when Mr. Cohen called for the possession of same.

At the hearing in the turnover proceedings, the bankrupt Morris Eisenberg asserted that this exhibit was not a record of the business, but was "Little Al's" personal record which was kept for the purpose of deceiving the union (N.T. 22, 23). The bookkeeper, Evalyn Miller, testified that she did not keep this record, but the testimony discloses that there were other records admittedly belonging to the bankrupts which she did not keep. An inspection of the book discloses obvious erasures. Objection was made to the offer of the book in evidence. The referee held the matter under advisement, and, at the conclusion of the hearings, ruled that it was inadmissible as evidence on the grounds that the trustee failed to show that the book was kept in the ordinary course of business; that the entries were made at or about the times of the divers transactions therein stated; and that the entries were true and correct.

The court is of the opinion that the referee erred in ruling out this exhibit. The referee mistakenly applied the "shop book rule" in determining the admissibility of the document. It is true that if this were a suit for goods sold and delivered, the "shop book rule" should be strictly followed. However, this record was in the nature of an admission by the bankrupts, and can be used for whatever

probative value it may have against them. The book in question was admittedly used by the bankrupts in the determination of their affairs, and was actually found in the bankrupts' place of business and turned over to the trustee or the trustee's accountant as one among other of the bankrupts' records. The mere fact that there were erasures does not render the document inadmissible; otherwise, it would be in any bankrupt's power, by the simple device of mutilating his records, to render impossible an honest examination of his affairs. The relevancy and probative value is, of course, a matter for the particular case. In the instant proceeding, this exhibit sheds light on the transactions of the bankrupts, and in a large measure substantiates the trustee's contentions.

■ "Little Al", who was available, was not called as a witness by either side, but inasmuch as this is a record possessed by the bankrupts, reflecting their operations, and previously identified as such by them, their failure to call "Little Al" weighs heavily against them.

■ As to the second question, the inventory and appraisement of May 31, 1938, was prepared by Fred B. Emerson, the bankrupts' own certified public accountant. Mr. Emerson testified that the inventory was made by actual count in the presence of Morris Eisenberg, one of the bankrupts, who assisted in making the inventory and approved of same. Morris Eisenberg denied that he was present at the time or approved the inventory, and he further denied that the inventory was accurate.

Were the accuracy of this inventory based on conflicting evidence involving only questions of credibility of witnesses, the court would not disturb the referee's finding and substitute its views for those of the referee. The accuracy of this inventory is, however, supported by arithmetical computation from admitted or undisputed facts. The bankrupts made an inventory on November 30, 1937, which has been admitted to be correct. This inventory shows 2,128 suits to be on hand at that time. Starting with that inventory we can make the following table:

Inventory of 11/30/37 ........ 2,128 suits
Firm's production 12/1/37 to
  5/1/38 .................. 12,769 "
                   —————
Total to be accounted for..... 14,897 "

Less sales 12/1/37 to 5/31/38 12,540 "
                   —————
Units that should be on hand
  5/31/38 .................. 2,357 "

The total of the units actually appearing on the inventory of May 31, 1938, is 2,349 suits, a difference merely of eight suits. The court is, therefore, of the opinion that the inventory of May 31, 1938, is substantially borne out by mathematical computation, and holds that the referee was in error in discarding the Emerson inventory.

This brings us to the important question of whether the testimony of Morris Cohen and his staff is based upon clear and convincing proofs:

Mr. Cohen, a certified public accountant was employed by the trustee. His testimony was based upon examination of the following documents offered in evidence:

(1) An inventory dated November 30, 1937 (undisputed);

(2) An inventory dated May 31, 1938;

(3) An inventory dated June 20, 1938 (likewise undisputed);

(4) The receipts given by the contractors who assembled or fabricated the coats and pants;

(5) The checks given in payment to these contractors;

(6) A certain check given by the bankrupts to their brother, Abe Eisenberg, representing payment of two cents additional for each pair of pants made up by him;

(7) The cutting record (i. e. Exhibit 27);

(8) The sales records.

Mr. Cohen made the following computation, starting from the inventory of May 31, 1938:

Number of units of suits in May 31,
  1938 inventory ................. 2,349
Number of units of suits in June 20,
  1938 inventory ................. 1,222
                 —————
  Difference .................... 1,127
Less sales between May 31, and June
  20, 1938 ...................... 387
                 —————
  Number of units short......... 740

Thus, he established a shortage of 740 suits, based on the disputed inventory of May 31, 1938 as a starting point.

Mr. Cohen then proceeded independently of the disputed inventory and "started from scratch" from May 1, 1937, the date the

bankrupts started in business. The witness testified that an examination of the contracting records or receipts given by the contractors, and the checks given to them in payment, showed that 20,863 coats were manufactured from May 1, 1937, to the time of bankruptcy. Miss Miller, the bankrupts' bookkeeper, identified the contracting records or receipts given by the contractors, and stated that the merchandise returned by them was checked against these records, to determine whether the exact quantity that had been sent to them was returned; a settlement was then made with each of them and checks in payment thereof followed.

By the same method, Mr. Cohen established that 37,313 pairs of pants were manufactured during the same period; he even split up this period, and showed that 15,206 pairs of pants were manufactured between May 1, 1937, and November 30, 1937, and 22,107 between December 1, 1937, and the time of bankruptcy.

This computation of the number of pants manufactured is corroborated by the check given by the bankrupts on the eve of bankruptcy (June 11, 1938) to Abe Eisenberg, the pants contractor and brother of the bankrupts, in the sum of $744.76. This check, the bankrupts explained, was an additional payment to the brother, at the rate of two cents per pair of pants, under a previous arrangement whereby they had agreed that they would give him the extra two cents "if he (the brother) is going to lose money" on the operation. This check would, therefore, be in payment of 37,238 pairs of pants. This last-mentioned figure is substantially in accord with the figure of 37,313 pairs of pants previously established by Mr. Cohen.

Mr. Cohen then established that the sales records showed sales of 19,036 coats and 33,519 pairs of pants between May 1, 1937, the beginning of the business, to the close of business; or, to set forth Mr. Cohen's computation in tabular form:

| | Coats | Pants |
|---|---|---|
| Production May 1, 1937 to June 21, 1938....... | 20,863 | 37,313 |
| Net sales May 1, 1937 to June 28, 1938......... | 19,036 | 33,519 |
| Merchandise to be accounted for .......... | 1,827 | 3,794 |
| Merchandise on hand.... | 1,087 | 1,446 |
| Merchandise unaccounted for ................. | 740 | 2,348 |

The bankrupts manufactured one-pants suits and two-pants suits. However, the trustee and his accountants have given the bankrupts the benefit of the doubt, and have considered that all of the suits were two-pants suits. It would, therefore, require 1,480 pairs of pants to go with the 740 coats to make up 740 complete suits. This would leave a balance made up of the difference between 1,480 pairs of pants and the total production of 2,348 or 868 pairs of pants to be accounted for.

This brings us to the consideration of Exhibit 27. This book had been previously used by the bankrupts' accountants in attempting to justify their original offer of settlement. It shows that separate figures were maintained for the production of the coats, vests and pants. Every lot of coats and corresponding lots of vests and pants were identified by the same number, and the numbers were consecutively issued to each new lot of work. By a comparison of the quantities shown by each lot number, to the corresponding items of payment by lot number to the contractors, the trustee's accountant found that there were differences in seventeen instances. An inspection of the record shows in most cases visible evidence of erasures or changes.

Comparison of Exhibit 27 with payment records and contractors' receipts demonstrates a parallel understatement in coats, vests and pants, with respect to lots designated numbers 34, 37, 71, 81 and 122; and with regard to the pants beginning with lot number 38 the understatement is significantly exactly fifty per cent. The total understatement in Exhibit 27 is likewise illuminating. There is an understatement with respect to 711 coats and with respect to 2873 pants.

Exhibit 27, standing by itself, does not disclose a shortage. Its pertinency lies in the fact that by comparison with the other records of the bankrupts, it discloses an obvious effort to conceal the shortage.

It will be observed that the method of accounting that has been used by the trustee is a "unit" accounting, as distinguished from a "valuation" accounting. In other words, the trustee has shown that by actual mathematical computation there are missing 740 complete suits and 868 additional pairs of pants, which the bankrupts should have on hand. This has absolutely nothing to do with the values of the garments in question, and an order might well lie against the bankrupts directing them to

turn over the missing garments regardless of valuation.

The specific values fixed in the inventory of May 31, 1938, might well have been adopted, since there was testimony that the bankrupts supplied the values therein. The trustee's accountant, however, based his valuation on the lowest cost figures of the inventory of June 20, 1938, which the bankrupts themselves supplied and authenticated. The following is a computation of the valuation:

true that Mr. Cohen estimated, or averaged, the quantities and valuation of linings and trimmings, and the referee would have been justified in rejecting the valuation of the linings and trimmings, although there was unquestionably a shortage. The trustee, however, has abandoned the demand for the value of the linings and trimmings, and this point need not be considered further.

The bankrupts seem to concede that there was a shortage, but try to explain it away

### Inventory June 20
### Used by Trustee

| Suits | | Range | Lowest Values | Quantity | Cost Value |
|---|---|---|---|---|---|
| Staples | | 2000 | $14.00 | 160 | $ 2,240.00 |
| Worsted Fancies | | 5700 | 14.10 | 42 | 592.20 |
| " | " | 6000 | 14.60 | 109 | 1,591.40 |
| " | " | 8000 | 15.50 | 260* | 4,030.00 |
| " | " | 100 | 12.00 | 1 | 12.00 |
| Gabardines | | 7–9000 | 13.45 | 74 | 995.30 |
| Tropicals | | 200–300 | 8.00 | 114 | 912.00 |
| | | | | 760 | $10,372.90 |
| (*) Less unallocated ranges credited | | | | | |
| (pp. 103, 104, 239, N.T.) | | | | 20 | 310.00 |
| | | | Total ........ | 740 | $10,062.90 |
| Pants | | —— | 2.75 | 868 | 2,387.00 |
| | | | Total Suits and Pants ............. | | $12,449.90 |

The bankrupts are therefore short 740 suits and 868 pants, all having a total cost value of $12,449.90. This computation is based on the bankrupts' own records which appear in evidence.

The referee is in error in stating that Mr. Cohen's testimony was based upon facts outside of the record and were mere conclusions. It is true that Mr. Cohen testified that he attempted to, and did, confirm his computations by other sources, his experience, and inquiries in the clothing trade generally, but this was done independently of the bankrupts' books and records. His testimony is based upon the books and records of the bankrupts. It is also true, as the referee states, that Mr. Cohen "drew his conclusions from his examinations" but the term "conclusions" here is equivalent to mathematical computation. It is likewise

by saying that credit has not been given for garments done over or "refelled".

The referee's decision is not based upon the testimony as to refelling. It is my opinion that the testimony of Eisenberg and D'Arenza, one of the contractors, as to the refelling is not worthy of credence. It is unsupported by any written record, and so vague and indefinite as to be of no value. Indeed, D'Arenza's testimony fixes the refelling as having occurred prior to the admitted inventory of November 30, 1937. If this be believed, the refelling cannot possibly account for the shortage.

The order of the referee dismissing the trustee's petition is therefore reversed, and the bankrupts are directed to turn over to the trustee 740 suits and 868 pairs of pants, or their value in the sum of $12,449.90.